1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Edward W. Swanson, SBN 159859
ed@smllp.law
Britt Evangelist, SBN 260457
britt@smllp.law
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

Attorneys for RACO JORDANOV

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>   vs.<br><br>RACO IVANOV JORDANOV<br><br>              Defendant. | Case No.  CR 21-00227 WHA<br><br>**DEFENDANT RACO JORDANOV'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE PURSUANT TO 18 U.S.C. § 3553(A)**<br><br>Crt.: Hon. William Alsup<br>Sentencing hearing: March 15, 2022 at 2:00 p.m. |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     THE PLEA AGREEMENT AND THE PRESNTENCE REPORT ........................... 2

    A.      The Plea Agreement ................................................................................ 2

    B.      The Applicable Guidelines and the Presentence Report ("PSR") .................. 2

        1.      The Guidelines ............................................................................ 2

        2.      Remaining Objections to the Presentence Report ............................ 6

III.    SENTENCING RECOMMENDATION ................................................................. 7

    A.      The Offense Conduct and the History and Characteristics of Racho
        Jordanov Justify the Recommended Sentence ................................................. 7

        1.      The offense conduct ............................................................................ 7

        2.      The history and characteristics of the defendant ................................. 9

            i.      *Mr. Jordanov's extraordinary acceptance of responsibility
               and his efforts to right his wrongs* ........................................... 9

            ii.     *Mr. Jordanov's recent cancer diagnosis and treatment* ........ 10

            iii.    *Mr. Jordanov's background* ................................................. 12

    A.      A Sentence of Six Months of Custody and Nine Months of Home
        Confinement is Sufficient but not Greater Than Necessary to Achieve the
        Goals of Sentencing ................................................................................ 16

    B.      The Goals of Sentencing Can be Achieved Without Imposing a Fine .......... 18

IV.     CONCLUSION .................................................................................................... 19

**Sentencing Memorandum**
*United States v. Jordanov and Lin*
CR 21-00227-WHA

# TABLE OF AUTHORITIES

## FEDERAL CASES

*See United States v. Shaw*, 3 F.3d 311 (9th Cir. 1993) ............................................................... 4

*United States of Am. v. Pollock*, No. 3:14-CR-00186-BR, 2016 WL 1718192 (D. Or. Apr. 29, 2016) ..... 4

*United States v. Hughes*, 775 F. Supp. 348 (E.D. Cal. 1991) ...................................................... 4

*United States v. Hussain*, No. 16-CR-00462-CRB-1, 2019 WL 1995764 (N.D. Cal. May 6, 2019) ........ 5

*United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011) ........................................................ 4

*United States v. Pollock*, 700 F. App'x 577 (9th Cir. 2017) ....................................................... 4

*United States v. Snowden*, 806 F.3d 1030 (10th Cir. 2015) ....................................................... 3

*United States v. Yeaman*, 194 F.3d 442 (3d Cir. 1999) ............................................................ 4

*United States v. Zolp*, 479 F.3d 715 (9th Cir. 2007) ................................................................ 5

## FEDERAL STATUTES

18 U.S.C. § 3553(a) ................................................................................................. 1, 7, 11

## FEDERAL RULES

U.S.S.G. § 2B1.1 ..................................................................................................... 3, 4, 5, 6

U.S.S.G. § 3C1.1 ..................................................................................................... 3

U.S.S.G. § 5G1.1 ..................................................................................................... 3

## OTHER AUTHORITIES

J. Ulmer & C. Van Asten, Restrictive Intermediate Punishments and Recidivism in Pennsylvania, 16 FED. SENT. R. 182 (2004) .................................................................................. 17

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ........................ 17

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-49 (2007) ................................ 17

**Sentencing Memorandum**
*United States v. Jordanov and Lin*
CR 21-00227-WHA

-ii-

# I.     INTRODUCTION

Mr. Jordanov acknowledges that the criminal activity he engaged in was serious.   Mr. Jordanov and others stole confidential, proprietary, and trade secret information that belonged to Genentech, his former employer, and used that information to help JHL, Inc. ("JHL"), the biosimilar company[1] he founded.  Mr. Jordanov then concealed this misappropriation during negotiations of a strategic partnership agreement with Sanofi.  And he took steps that could have impeded the government's investigation.

Mr. Jordanov's crimes justify a custodial sentence, and the parties have agreed that one is appropriate in the Rule 11(c)(1)(C) plea agreement submitted to the Court.  However, the parties and the Probation Office agree that the appropriate sentence falls outside the range called for by the Sentencing Guidelines.  The parties and the Probation Office recommend that the Court find that Mr. Jordanov's extraordinary acceptance of responsibility, including his voluntary return to the United States from a non-extraditable country, justify a substantial downward variance from the Guidelines range.  The disagreement between the parties and the Probation Office concerns the precise amount of custodial and home confinement time that should be imposed. The Probation Office recommends a sentence of 18 months of custody followed by 180 days of home confinement, and the government asks the Court to order 15 months of custody followed by 30 months of home confinement, a sentence near the high end of the sentencing range agreed to by the parties.  Undersigned counsel submits that the sentences recommended by the government and Probation are greater than necessary to achieve the goals of sentencing and requests the Court impose a sentence of six months of custody and nine months of home confinement.  Such a sentence more appropriately accounts for all the 18 U.S.C. § 3553(a) factors, including Mr. Jordanov's social history, his voluntary return to the United States to face these charges, his recent cancer diagnosis, and the need for ongoing medical monitoring of his condition.

/ / /

---

[1] A biosimilar is a biological product that is highly similar to an FDA-approved pharmaceutical, known as a "reference product" or "innovator product," and that has no clinically meaningful differences in terms of safety and effectiveness from the reference or innovator product.

**Sentencing Memorandum**
*United States v. Jordanov and Lin*
CR 21-00227-WHA

## II.    THE PLEA AGREEMENT AND THE PRESNTENCE REPORT

### A.    The Plea Agreement

The parties entered into a Rule 11(c)(1)(C) plea agreement that initially provided for a custodial sentence of between one year and 18 months, to be followed by a period of home confinement of between six and 36 months.  Dkt. 21 (plea agreement), ¶ 8.  The stipulated custodial and home confinement ranges reflected, among other things, the fact of Mr. Jordanov's extraordinary acceptance of responsibility in this case.  As stated in the plea agreement, in June of last year Mr. Jordanov decided to return to the United States from Taiwan, a country with which the U.S. does not have an extradition treaty, to resolve this case.  Dkt. 21, ¶ 2, 9:6-9:12; *see also* Dkt. 33, (Presentence Report, "PSR"), ¶¶ 38, 43.  He also encouraged his co-defendant and life partner Rose Lin to return to the United States (*id.*) and thus assisted the government in quickly and efficiently resolving this case in full.  The parties recently stipulated to modify the plea agreement to allow Mr. Jordanov to argue for, and the Court to impose, a term of imprisonment as low as six months.  The parties agreed to this modification because, following plea negotiations and entry of his guilty plea, Mr. Jordanov was diagnosed with kidney cancer and underwent surgery to have the tumor removed, and because he will require continued medical attention to monitor for recurrence.

The plea agreement also provided that if Mr. Jordanov entered into civil settlement agreements with the corporate victims of his crimes, the government would not seek a further restitution order from the Court and would consider his efforts to make his victims whole in weighing whether to seek any other financial penalty.  Dkt. 21, ¶ 8.[2]

### B.    The Applicable Guidelines and the Presentence Report ("PSR")

#### 1.    The Guidelines

As reflected in the plea agreement and the PSR, Mr. Jordanov's base offense level is 6, a 20-point enhancement is applied based on the gain figure in this case,[3] and an additional 4 points are added

---

[2] Mr. Jordanov has entered into confidential settlement agreements with the corporate victims.  Both victims have indicated they are satisfied with the restitution he provided and are not seeking additional restitution amounts.  Dkt. 33, PSR at ¶¶ 40-41.

[3] The plea agreement provides for a 20- to 24-point enhancement based on the disputed gain amount in

**Sentencing Memorandum**
*United States v. Jordanov and Lin*
CR 21-00227-WHA

under U.S.S.G. § 2B1.1(b)(10)(B) and (b)(14)(A), because the trade secrets were transported out of the United States and a substantial portion of the offense conduct occurred outside the United States.  Dkt. 21, ¶ 7.  Two points are also added under U.S.S.G § 3C1.1(A) for obstructive conduct.  The resulting Total Offense Level, after a reduction for acceptance of responsibility, is 29.  *Id.*; *see also* PSR, ¶ 56.  Mr. Jordanov has no prior convictions and a Criminal History Category of I.  PSR, ¶¶ 57-63.  The advisory Guidelines recommend a sentencing range of between 87 to 108 months, but because the statutorily authorized term for the offense of conviction is 60 months, the guideline sentence in this case is 60 months before any variance.  PSR, ¶ 102; U.S.S.G. § 5G1.1(a).

While Genentech did not suffer a loss for Guidelines purposes as a result of the trade secret theft,[4] Sanofi did suffer a loss from the fraud conduct.  However, because there was no intended loss, and because it is not possible to determine the actual loss, the parties have agreed to use gain as a proxy

---

this case. Dkt. 21, ¶ 7.  As discussed below, Mr. Jordanov submits that a 20-point enhancement is appropriate.

[4] There are a number of reasons that the criminal activity did not result as a loss for Genentech as that term is interpreted for Guidelines purposes.  First, JHL's biosimilar pharmaceuticals were never marketed or sold.  *See GNE v. JHL*, et al., No. 18-6582-WHA, Dkt. 77 at 3, 7-8 (explaining that JHL's biologics had not been approved by regulators and were not being marketed and sold in any jurisdiction).  JHL biosimilars thus never competed with Genentech products in any manner, and Genentech suffered no loss of market share or sales.  Second, while application note (3)(C)(ii) to U.S.S.G. § 2B1.1 provides that a loss calculation may include "the cost of developing [the stolen trade secret] information or the reduction in the value of that information that resulted from the offense," such a loss calculation does not apply in this case.  The trade secret theft here did not lead to a business loss for the victim company, rendering the use of development costs as a proxy for actual loss inappropriate. *See United States v. Snowden*, 806 F.3d 1030, 1032-33 (10th Cir. 2015) (inappropriate to use costs of development as actual loss where evidence in the record indicated the company suffered no business losses but affirming as harmless error).  Nor can the development costs for the trade secrets misappropriated be used as a proxy for intended loss where, as here, the evidence does not suggest the defendant intended for his victim to lose an amount equivalent to the development costs.  *See* U.S.S.G. § 2B1.1, app. note (3)(A)(ii) (defining "intended loss" as "the pecuniary harm that the defendant purposefully sought to inflict"); *see also United States v. Yu Xue*, No. CR 16-22, 2020 WL 5645765, at *15 (E.D. Pa. Sept. 22, 2020) (rejecting government's argument that the defendants intended a loss amount equal to development costs in trade secret theft prosecution because under the Guidelines the "Government must show that a defendant had the requisite subjective intent" to "'purposely sought to inflict' a specific monetary amount of loss on the victim" and failed to do so).

**Sentencing Memorandum**
*United States v. Jordanov and Lin*
CR 21-00227-WHA

for the loss amount.  U.S.S.G. § 2B1.1, app. note 3(B); *see also* Dkt. 21, ¶ 7 (parties' agreement to use gain as a proxy for loss); PSR, ¶ 46 (appropriate to use gain as proxy for loss).

The parties have agreed that intended loss does not provide a useful figure for calculating the Guideline enhancement because no loss was intended by the criminal conduct.  Intended loss is defined in the Guidelines as the "pecuniary harm that the defendant purposely sought to inflict." U.S.S.G. §2B1.1, app. note (3)(A)(ii).  The defendant's subjective intent, as opposed to the objective risk created by the defendant's conduct, determines the intended loss amount.  *See United States v. Shaw*, 3 F.3d 311, 312 (9th Cir. 1993) ("We agree that 'intended loss' is the amount the defendant subjectively intended not to repay."); *United States of Am. v. Pollock*, No. 3:14-CR-00186-BR, 2016 WL 1718192, at *3 (D. Or. Apr. 29, 2016), aff'd sub nom. *United States v. Pollock*, 700 F. App'x 577 (9th Cir. 2017) ("'Intended loss' does not mean a loss that the defendant merely *knew* would result from his scheme or a loss he might have *possibly and potentially* contemplated." citing and quoting *United States v. Manatau*, 647 F.3d 1048, 1050 (10th Cir. 2011)) (emphasis in original).  Here, Mr. Jordanov did not intend for Sanofi to suffer any loss through its partnership with JHL; rather, he hoped that JHL's partnership with Sanofi would succeed, resulting in financial success for both companies and himself as JHL's President, CEO, and shareholder.  Where, as is the case here, the defendant's fortunes rose and fell with those of his victim, it cannot be said that he "intended" a loss.  *See United States v. Hughes*, 775 F. Supp. 348, 350 (E.D. Cal. 1991) ("At the time of the offenses here, defendant did not intend for the banks to suffer any economic loss as a result of the loans. Much to the contrary, in order for the banks to incur a loss on foreclosure, it would have meant that the girlfriends or relatives of defendant or Mittelman would have to lose their homes along with the down payments they had made on the homes. That is not at all what defendant intended to happen."); *United States v. Yeaman*, 194 F.3d 442, 460 (3d Cir. 1999) (We do not agree that Yeaman and his co-conspirators intended to cause a loss equal to the amount of the represented value of the leased stocks. . . . Here, Yeaman and the others undoubtedly hoped that their fraudulently inflated securities would never have to be sold and that the scheme would continue for the indefinite future.").

Regarding "actual loss," this is not a case the actual loss to the victim of the fraudulent conduct can determined with any precision.  In December 2016, Sanofi invested in JHL at approximately $3.00

per share.[5] JHL then experienced a decrease in value over the next several months,[6] before delisting in February 2018, months before the revelation of the criminal conduct in this case, at $2.10 per share.[7] Thus, not all the decline in the value of the JHL shares owned by Sanofi can be attributed to the criminal conduct in this case. PSR, ¶ 35. Moreover, JHL continues to operate today as Eden Biologics, focusing on biosimilar development, and Chime Biologics, focusing on contract development and manufacturing. Both companies continue to operate,[8] and Sanofi remains a stockholder in these companies (PSR, ¶ 34) and is pursuing recovery of any losses through a confidential arbitration procedure that has yet to conclude. Declaration of Britt Evangelist in Support of Defendant Raco Jordanov's Sentencing Memorandum ("Evangelist Decl."), ¶ 2. It would simply not be correct to conclude that Sanofi's $100 million investment is now worth $0 or that Sanofi will not recover its losses through the parallel litigation. While Mr. Jordanov does not dispute that Sanofi has suffered a loss, the parties agreed, and the Probation Office concurs, that the amount of that loss cannot reasonably be determined at this time. Given that neither intended or actual loss can be determined, it is appropriate for the Court to use gain as a substitute for loss. U.S.S.G. § 2B1.1 app. note (3)(B).

Regarding a calculation of gain, courts look to the gain realized by the defendant "that resulted from the offense[.]" U.S.S.G. § 2B1.1 app. note (3)(B). In calculating that amount, it is appropriate to separate out the salary, bonuses, and stock amounts the defendant earned for legitimate work from what he earned through fraud. *United States v. Hussain*, No. 16-CR-00462-CRB-1, 2019 WL 1995764, at *6 (N.D. Cal. May 6, 2019); *see also United States v. Zolp*, 479 F.3d 715, 719–20 (9th Cir. 2007) (when

---

[5] *See* https://www.biosimilardevelopment.com/doc/sanofi-and-jhl-biotech-announce-strategic-biologics-alliance-in-china-0001 (Sanofi investment at $90 NT per share) and https://www.exchangerates.org.uk/TWD-USD-spot-exchange-rates-history-2016.html (historical conversion rates for NT to USD, showing $90 NT roughly equivalent to $3 USD)

[6] *See* https://www.gurufocus.com/term/mktcap/ROCO:6540/Market-Cap/JHL-Biotech (showing decrease in JHL market cap between December 2016 and June 2017).

[7] See https://www.biospace.com/article/around-the-web/jhl-shareholders-approve-voluntary-de-listing-from-taiwan-exchange/ (voluntary delisting in February 2018) and https://www.investing.com/equities/jhl-biotech (trading price for JHL stock over time).

[8] *See* https://www.edenbiologics.com/ and https://chimebiologics.com/

**Sentencing Memorandum**
*United States v. Jordanov and Lin*
CR 21-00227-WHA

calculating loss on the basis of stock movement due to fraud, "the court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes"). In *Hussain*, the court reasoned that the defendant's "salary, bonuses, and equity compensation are, at least in part, the result of legitimate work. . . [and] cannot be said to have 'resulted from the offense." *Hussain*, 2019 WL 1995764, at *6 (citing U.S.S.G. § 2B1.1 app. note (3)(B)). The court further found there was "no mechanism . . . to disentangle what portion of [the defendant's] income from his time with [his company] was attributable to his legitimate work and what portion was attributable to the fraud for which he was convicted." *Id.* As a result, the court found it inappropriate to rely on the defendant's salary and bonuses for the gain calculation and instead "look[ed] to the gain that indisputably and solely resulted from the fraud" – the increase in the value of the defendant's stock attributable to the fraud. *Id.* at *7.

Given that JHL continues to operate today (as Eden Biologics and Chime Biologics) and given Mr. Jordanov's key role in founding and growing the company (as in *Hussain*), it cannot be said that all his salary, bonuses, and stock awards "resulted from the offense." Mr. Jordanov submits a formula similar to that used in *Hussain* should be used to calculate his gain here. The Probation Office agrees and has calculated Mr. Jordanov's gain from the offense conduct to be $13,139,046.40, resulting in 20-point enhancement under § 2B1.1(b)(1)(K). PSR, ¶ 46. The defense concurs with that calculation.

2.    <u>Remaining Objections to the Presentence Report</u>

Mr. Jordanov has no objection to the factual recitations in the PSR and agrees with the Probation Office's Guidelines calculation.

Mr. Jordanov disagrees with Probation Office's recommendation that the Court should impose 18 months of custody and a $10,000 fine, as discussed further below.

The Probation Office recommends that Mr. Jordanov serve a home confinement term of 180 days that would commence within 60 days of his release from custody. PSR, Recommendation, at 3. The Probation Office recommends that the term of home confinement not begin immediately following Mr. Jordanov's release from custody, so that Mr. Jordanov may use that 60-day period to "to travel to Southern California to visit with his daughters and grandchildren prior to his placement on location monitoring" and conduct "follow up with his medical providers to determine the status of his health,

establish an appropriate treatment plan, and arrange his volunteer work." *Id*.  While Mr. Jordanov submits that a nine-month term of home confinement (when paired with six months of custody) represents the most appropriate sentence here, he appreciates that the Probation Office's recommendation allows him to travel to see his family in Southern California following incarceration and joins in that recommendation.  Mr. Jordanov requests that should the Court impose a lengthier term of home confinement, he be allowed to travel to Southern California to visit his family during that term as well.

## III.    SENTENCING RECOMMENDATION

As discussed below, the 18 U.S.C. § 3553(a) factors – particularly the history and characteristics of Mr. Jordanov and Mr. Jordanov's extraordinary acceptance of responsibility, including his voluntary return to the United States and his efforts to compensate the corporate victims,  support a downward variance and a sentence of six months of imprisonment and nine months of home confinement.

### A.    The Offense Conduct and the History and Characteristics of Racho Jordanov Justify the Recommended Sentence

#### 1.    The offense conduct

The plea agreement accurately summarizes Mr. Jordanov's offense conduct.  Dkt. 21, ¶ 2.  Mr. Jordanov, as well as other JHL employees acting with Mr. Jordanov's consent or at his direction, stole from Genentech.  They stole documents and information, and in one instance they even employed a Genentech scientist as the *de facto* head of a biosimilar development team at JHL (the Formulation Team) while that scientist was still working at Genentech.  Mr. Jordanov's theft and use of Genentech confidential information constituted a significant breach of the trust Genentech had placed in him.  And he assisted other former Genentech employees in similar breaches of trust when he tolerated, encouraged, and directed their use of Genentech materials at JHL.  While Mr. Jordanov may not have known the full extent of what was taken and what was used, he knew of the use of Genentech materials and information at JHL and did nothing to stop it.  He acknowledges he is responsible for all the misappropriation of Genentech's material that occurred while he was JHL's President and CEO.

Mr. Jordanov compounded these problems when he failed to disclose the misappropriation and use of Genentech material to JHL's prospective investor and partner, Sanofi.  Mr. Jordanov met with

Sentencing Memorandum
*United States v. Jordanov and Lin*
CR 21-00227-WHA

-7-

Sanofi representatives on multiple occasions both to pitch Sanofi on the partnership and to negotiate the contours of the prospective partnership.  Sanofi also performed extensive due diligence on JHL before deciding to partner.  Mr. Jordanov well understood that Sanofi would not enter into a partnership agreement with JHL if he disclosed the use of Genentech documents, information, and expertise at JHL, and, accordingly, he kept quiet.  He kept quiet and signed a partnership agreement that concealed the malfeasance and falsely represented to Sanofi that JHL had not used any other company's documents, information, intellectual property, or know-how in creating its products.

As troubling as this conduct is, it is important to understand that Mr. Jordanov did not set out to create a company that relied on pilfered trade secrets.  He conceived of JHL as a legitimate company that would develop and sell biosimilars that JHL had created through their own hard work and that would be of benefit particularly to the developing world.  Dkt. 21, 3:22-4:09.  As Mr. Jordanov explains in his statement to the Court:

> When I founded JHL Biotech I truly did not set out to harm anyone.  I wanted to build a biosimilar company that could make life saving medicines at a much lower cost and then that medicine would be available to many more people throughout the world.  My intention was to develop and manufacture, especially for developing countries, a series of cancer drugs that could be produced and supplied at a fraction of the normal cost charged by larger pharmaceutical companies.

Evangelist Decl., **Exhibit A** (defendant's letter to the Court).  Many of the letters from Mr. Jordanov's friends and family likewise speak to his desire to help people through JHL.  Evangelist Decl., **Exhibit B** (letters of support) at 7-8 (letter from Mr. Jordanov's niece, explaining "My uncle inspired my career. His great idea to produce biosimilar drugs which will be available to poor people in developing countries who are not able to obtain the care they need is for me personally a beacon of hope."); *id.* at 20 (letter from colleague, Jim Miller, stating that "Throughout our careers, Racho and I shared in a common purpose of doing whatever we could in our professional careers to improve access to life-saving medicines to patients in need. I know he wanted to further this purpose by founding JHL.").

When he founded JHL, Mr. Jordanov believed that the know-how and experience he and others had developed while at Genentech would provide the company with a competitive advantage.  Dkt. 21, 3:22-4:09.  However, it ended up not just being prior experience at Genentech that Mr. Jordanov and others relied upon.  They eventually used Genentech documents, information, and personnel, and Mr.

**Sentencing Memorandum**
*United States v. Jordanov and Lin*
CR 21-00227-WHA

-8-

Jordanov encouraged rather than prevented this from happening.  *Id*. at 5:06-5:15, 5:23-6:07.  As Mr. Jordanov candidly admits in his letter to the Court, he told himself "convenient excuse[s]" to justify his and JHL's use of Genentech's information, all so that he could continue to build the company he so desperately wanted to see succeed.  Evangelist Decl., **Exhibit A**.  Likewise, while he did not set out to defraud Sanofi (dkt. 21, 9:08-9:12), Mr. Jordanov ended up doing so when chose to conceal the use of Genentech information and documents, rather than disclose the pertinent facts to Sanofi and risk losing the prospective deal.  *Id*. at 8:23-9:12.  As Mr. Jordanov explains in his letter to the Court,

> I lost sight of the good the company could do if I ran it properly, and I let my ambition and ego convince me that I didn't have to stick to the rules while I did it . . . I told myself that it was worth it to build my company[.]

Evangelist Decl., **Exhibit A**.

Mr. Jordanov fully acknowledges this conduct was serious, it was criminal, and it deserves punishment.  While he may not have intended to take the company down this road, that is what he did.  However, the complicated intentions behind the offense conduct, combined with the factors discussed below, support a sentence of six months of custody and nine months of home confinement.

2.       The history and characteristics of the defendant

i.       *Mr. Jordanov's extraordinary acceptance of responsibility and his efforts to right his wrongs*

In June 2021, before the government publicly charged this case and without any prompting from the prosecutor, Mr. Jordanov asked undersigned counsel to contact the government.  His instructions were clear: negotiate a plea agreement that allowed him to return to the U.S., accept responsibility for his actions, and plead guilty.  From early in the negotiations, Mr. Jordanov understood any agreement would require him to serve time in custody.  He nonetheless chose to voluntarily return from Taiwan, a country without an extradition treaty with the U.S. where he could have continued to reside for many years to come.  PSR, ¶ 43.  He did so for two reasons.  First, he did not want this case to remain unresolved for him and for all the parties involved.  And second, he felt he needed to return to be with his family after the tragic death of his son-in-law.  He also encouraged his co-defendant and life partner, Rose Lin, to return to the U.S. as well.  Dkt. 21, ¶ 2, 9:6-9:12; PSR, ¶ 38.  In so doing, he assisted the government in closing the case without further litigation or expense.

**Sentencing Memorandum**
*United States v. Jordanov and Lin*
CR 21-00227-WHA

Mr. Jordanov also agreed to try to make his victims whole by entering into civil settlement agreements. Dkt. 21, ¶ 8. He did so promptly. Both corporate victims have informed the Probation Office and the government that they are satisfied with the restitution Mr. Jordanov has paid under the terms of confidential settlement agreements and are not seeking anything further. PSR, ¶ 40-41. In addition, Mr. Jordanov has been and will continue to provide Sanofi with truthful information regarding his crimes and the misconduct of others at JHL. Evangelist Decl., ¶ 5; PSR, ¶ 41. Mr. Jordanov has debriefed with Sanofi's counsel on multiple occasions, is in the process of finalizing a declaration that will be submitted by Sanofi in confidential arbitration proceedings, and has committed to testifying at an evidentiary hearing in those proceedings in May 2023 if necessary. Evangelist Decl., ¶ 5.

This level of acceptance is highly unusual, especially for a defendant who resided outside the jurisdictional reach of prosecutors. Undersigned counsel expects that government counsel will concur in this assessment and express to the Court that Mr. Jordanov's decision to voluntarily return to the U.S. and to make prompt and satisfactory restitution to his victims should weigh heavily as a mitigating factor. Counsel submits that a sentence of six months of custody and nine months of home confinement would properly reflect this extraordinary acceptance.

ii.     *Mr. Jordanov's recent cancer diagnosis and treatment*

In the late fall of last year, Mr. Jordanov received an MRI scan to evaluate his degenerative spine disease. The MRI revealed masses in each of Mr. Jordanov's kidneys. Further testing determined that the mass in his right kidney was likely malignant. This was not Mr. Jordanov's first cancer diagnosis, having survived bladder cancer just over a decade ago. On January 13, 2022, Mr. Jordanov underwent surgery to remove the suspected cancer. Following removal, a biopsy confirmed Mr. Jordanov had renal carcinoma. PSR, ¶ 81-82; Evangelist Decl., ¶ 6. Mr. Jordanov's doctors believe the surgery successfully removed the cancerous legion, and given that success, they believe there is a low chance of reoccurrence. They have prescribed ongoing monitoring via MRI and/or ultrasound scan at approximately three, six, and 12 months post-surgery to detect and promptly treat any reoccurrence. PSR, ¶ 82; Evangelist Decl., ¶ 7.[9]

---

[9] Mr. Jordanov's first post-surgery MRI took place last week and confirmed that the procedure removed the cancerous tumor. Evangelist Decl., ¶ __.

Sentencing Memorandum
*United States v. Jordanov and Lin*
CR 21-00227-WHA

-10-

18 U.S.C. § 3553(a)(2)(D) instructs the court to consider the need for the sentence imposed "to provide the defendant with needed . . . medical care. . . in the most effective manner." While the government may contend that the Bureau of Prisons ("BOP") can provide competent medical care for Mr. Jordanov during incarceration, recent reports by the Office of the Inspector General call into question the BOP's abilities in that regard. A 2016 study by the Office of the Inspector General explained that "recruitment of medical professionals is one of the BOP's greatest challenges and staffing shortages limit inmate access to medical care[.]" *See* Review of the Federal Bureau of Prisons' Medical Staffing Challenges, Office of Inspector General, USDOJ.[10] The situation has only become more dire during the COVID-19 pandemic, which "exacerbated, or diverted attention from, other longstanding challenges confronting the BOP," including staffing shortages and inmate medical care costs. *See* Top Management and Performance Challenges Facing the Department of Justice-2021, Office of the Inspector General, USDOJ, at 12-14.[11]

Moreover, even if BOP can be relied on to provide the necessary monitoring and treatment, imprisoning Mr. Jordanov for more than six months will result in the cost of that specialized medical care being shifted to taxpayers. At sentencing, Mr. Jordanov anticipates requesting a self-surrender date that will allow him to remain out of custody long enough to undergo his second MRI/CT scan in early- to mid-June. If Mr. Jordanov then begins a six-month term of imprisonment in July, he will be released from custody in time for his third and final MRI/ultrasound in late in late-January 2023. A six-month custodial sentence will thus provide Mr. Jordanov with medical care "in the most effective manner." 18 U.S.C. § 3553(a)(2)(D); *see also United States v. Edwards*, 595 F.3d 1004, 1011, 1018 n.10 (9th Cir. 2010) (district court did not abuse discretion by varying downward in fraud/false statement case where "imprisoning [defendant with diabetes and related complications] would simply pass the cost of medical care on to taxpayers" and a "sentence of probation would satisfy the requirement of providing needed care in the most effective manner," even though BOP "was capable of providing for [his] medical care"); *United States v. McFarlin*, 535 F.3d 808, 810-12 (8th Cir. 2008) (recognizing propriety of

---

[10] Available at https://oig.justice.gov/reports/2016/e1602.pdf.

[11] Available at https://oig.justice.gov/sites/default/files/reports/2021.pdf.

"variances on the basis of poor health" and affirming sentence of 3 years' probation to be served under home detention, despite Guideline range of 78 to 97 months).

### iii.   Mr. Jordanov's background

Mr. Jordanov has lived a remarkable life, from his childhood and young adulthood in communist Bulgaria, to joining the U.S. military to put himself through college, to ascending the corporate ladder at various biotechnology and pharmaceutical companies.  As one of the letters submitted to the Court describes it, Mr. Jordanov's "life could be the subject of a very emotional and moving American dream story: a young boy coming from nothing, escaping a dictatorship, working and studying very hard, and finally succeeding to build a wonderful car[eer], to grow and provide for his family."  Evangelist Decl., **Exhibit B** at 7 (letter from Ekaterina Jordanova).

Mr. Jordanov grew up in Sophia, Bulgaria, the son of a pharmacist and a schoolteacher.  The family lived in a shared flat in a four-story building, but only the second floor was habitable because the upper floors had been destroyed during bombing by the allied forces in World War II.  Their flat had a shared kitchen and running but no hot water.  The family bathed at the communal bathhouse in their neighborhood, and they ate the food rations assigned to them by the local communist party.  As children, Mr. Jordanov and his brother would leave home every summer for a "camp" in the Bulgarian countryside, where they worked as farm hands on communal, party-owned farms.  Mr. Jordanov describes these camps as "more humane than forced labor, but we didn't have a choice."  PSR, ¶¶ 65-68.  In his letter to the Court, Mr. Jordanov's brother describes their living situation as children as "far below the poverty line" and their social standing as "outsiders" because their parents did not belong to the communist party.  Evangelist Decl., **Exhibit B** at 9 (letter from Colonel Dr. Straschimir Jordanov).  But even at a young age, Mr. Jordanov's brother recalls Mr. Jordanov being "a hard worker and he succeeded because of that."  *Id*.  Because he excelled in school and sports, Mr. Jordanov was accepted into the Polytechnical Institute of Bulgaria, where he studied mechanical engineering and competed in the pentathlon.  *Id*.; PSR, ¶ 69.

However, during his third year of college, Mr. Jordanov and his cousin participated in anti-communist/anti-Soviet meetings and protests as part of the demonstrations that predated and followed the Soviet invasion of Czechoslovakia in 1968.  Fearing reprisal from the Soviets and the Bulgarian

**Sentencing Memorandum**
*United States v. Jordanov and Lin*
CR 21-00227-WHA

government, Mr. Jordanov and his cousin fled the country through the border with Yugoslavia and made their way to an Italian refugee camp where they were interviewed by representatives of various Western countries, including the United States.  In November 1969, Mr. Jordanov and his cousin emigrated to the United States, where they lived with a Bulgarian family in Arcadia, California.  PSR, ¶ 70.  In 1970, Mr. Jordanov volunteered for the United States Army and served 21 months as a tank driver in South Korea before being honorably discharged with a rank of E4 Corporal.  PSR, ¶ 71, 90.

Upon return to civilian life, Mr. Jordanov used GI Bill education benefits to complete his bachelor's degree in biology in two years and graduated in 1974.  He later attended night school and earned a Master of Business Administration by 1981.  PSR, ¶¶ 72, 89.  Aside from a brief stint of employment with the State Department at the Bulgarian desk for the Voice of America program, Mr. Jordanov went on to have a nearly 50-year career in the biotechnology and pharmaceutical industry.  He worked for companies large and small, from startups to established players in the industry.  PSR, ¶¶ 72, 92-94.  He served in a variety of executive roles, but his responsibilities invariably included overseeing the construction of new and innovative manufacturing facilities.  PSR, ¶¶ 93-94.  In their letters to the Court, Mr. Jordanov's former colleagues describe him as an "industry leader" and "one of the key world-class pioneers in manufacturing operations" for monoclonal antibodies.  Evangelist Decl., **Exhibit B** at 19, 6 (letters from Jim Miller and Mars Ho).  And friends, family, and colleagues alike describe Mr. Jordanov as hard working and dedicated to his work, nearly to a fault.  *See e.g.*, *Id.* at 17 ("[M]y dad is one of the hardest working people I've ever witnessed . . . [and] was as dedicated to his work as anyone I've ever known."); *id.* at 19 ("I have always known Racho to be extremely hard working, conscientious and always delivered on commitments.").

While Mr. Jordanov was dedicated to his work, he did not do so at the expense of his family and colleagues.  Work provided Mr. Jordanov the means to help others.  For his family in Bulgaria, it meant decades of financial and professional assistance.  In his letter to the Court, Mr. Jordanov's brother describes how Mr. Jordanov sent the family money yearly to support them during communism, how he hosted his brother while he studied in the U.S., and how he supported his brother's family financially when PTSD prevented his brother from working.  Evangelist Decl., **Exhibit B** at 9-11.  Mr. Jordanov's niece tells of how he hosted her in America during her studies and helped her secure an internship that

**Sentencing Memorandum**
*United States v. Jordanov and Lin*
CR 21-00227-WHA

launched her career. *Id.* at 7-8.  For his former colleagues, Mr. Jordanov's generosity manifested in his willingness to mentor. *Id.* at 21 (retired scientist, Andrew Morozovsky, explaining how he sought "advice and guidance" from Mr. Jordanov throughout his career and that although "Racho [ ] had an accomplished career in his own right . . . [h]is legacy is the people he coached along the way.").

But it is in his treatment of complete strangers that Mr. Jordanov's empathy, compassion, and charity can be seen most vividly.  His daughters recall Mr. Jordanov teaching them at an early age to love, respect, and help those less fortunate.  Ashlei McAtee, Mr. Jordanov's youngest daughter writes in her letter to the Court:

> I remember that when my sister and I were young, he would assist those in need with large and small gesture. I recall him giving stranded or homeless individuals rides, always greeting them with a smile and sending them on their way with an encouraging word. As a child, what stuck out to me was how my dad always treated those in need as equals.  From a very early age he demonstrated to my sister and I his beliefs that every person deserves to be treated with kindness and respect, regardless of their socioeconomic status or physical appearance.

*Id.* at 15; *see also id.* at 25 (letter from Mr. Jordanov's eldest daughter, Jessica Young).

Mr. Jordanov's generosity can also be seen in how he has gone out of his way to help the people who enter his orbit.  Multiple letters submitted to the Court attest to how Mr. Jordanov has repeatedly helped recent immigrants to this country.  *E.g.*, Evangelist Decl., **Exhibit B** at 11 (recounting how Mr. Jordanov hosted a Bulgarian immigrant in his home in Boston for a year); *id.* at 16 (stating "My dad was always particularly generous to immigrants in need, because he knew he wouldn't have made it in this country without the people who helped him," and recalling memories of Mr. Jordanov hosting recent immigrants in the home and helping recent immigrants find employment).  In her letter to the Court, Iren Avgarski recalls how Mr. Jordanov helped her and her family when they emigrated to America from Bulgaria in 1985. *Id.* at 1-3.  Ms. Avgarski recalls Mr. Jordanov giving her "a full set of furniture and kitchen necessities, which we sorely needed at the time," just a few days after they first met. *Id.* at 1. Mr. Jordanov went on to help Ms. Avgarski enroll in English classes, craft a resume, and, most importantly, co-sign for a loan so she could purchase her first home:

> I remember him saying to me, "There is no way you can succeed alone. Everyone needs a helpful hand by others."  That is how I became a first-time homeowner of a small house. I was not able to quality for the mortgage by myself. He became a co-signer, and I was able to provide our own home for my family.  He helped provide a roof over our heads

**Sentencing Memorandum**
*United States v. Jordanov and Lin*
CR 21-00227-WHA

-14-

and convinced me - "You have what it takes to continue on with the payments."  That was all I needed to hear to overcome my own fear and doubts. Racho became our family saint!

*Id*. at 1-2.

Mr. Jordanov also gave generously to formal charities.  For example, Brian Hauser, Mr. Jordanov's nephew and a missionary with CMF International, writes in his letter to the Court about how Mr. Jordanov gave $40,000 to CMF to build a school in Burkina Faso.  Mr. Hauser explains, "[i]t is impossible to overstate the impact education has on the long-term development" of the communities served by that school.  *Id*. at 5; *see also id*. at 13-14 (David Lin, nephew of Rose Lin and CFO of TLC Charities, Inc., describing how "Mr. Jordanov generously donated both his time and money to our organization" over the years); *see also* PSR, ¶¶ 76-77.  After returning to the United States to resolve this case, Mr. Jordanov found a way in the past several months to contribute to his community by volunteering with the California State Parks Foundation.  Before his cancer diagnosis he volunteered regularly and had been accepted as "permanent long-term volunteer" with that program.  PSR, ¶¶ 77, 96.

Given his kindness to people outside of this family, it should come as no surprise that Mr. Jordanov is also a loving, caring, and supportive father and grandfather.  *E.g.*, Evangelist Decl., **Exhibit B** at 5 ("My childhood memories are of an engaging and fun-loving uncle . . . I have appreciated his enthusiasm as a father and grandfather who loves his daughters and grand-children very deeply."); *id*. at 12 ("As for Racho as a father, I have witnessed my brother raise with much love and dedication two beautiful daughters who found their way in life[.]"); *id*. at 23-24 (Mr. Jordanov's son-in-law, describing him as "a dedicated, caring, and loving father, father-in-law, and grandfather" and recounting how Mr. Jordanov "act[ed] as a mentor and father figure during a tine my young life when I desperately needed it.").  The letters from Mr. Jordanov's daughters speak not only of the joy he brought them as children by, for example, taking them on an "annual pilgrimage to Baja California to see the gray whale migration" and "visit[ing] countless national parks and some lesser-known beautiful scenic areas" (*id*. at 17), but also of the close relationship they continue to enjoy as adults and the joy he brings to his grandchildren.  *Id*. at 15-18 (letter from Ashlei McAtee); *id*. at 25-26 (letter from Jessica Young).  And in their interviews with the Probation Office, both daughters emphasized the importance Mr. Jordanov's support has made to them and his grandchildren since returning to the United States.  PSR, ¶¶ 74, 79.  In particular, Mr. Jordanov has played an important role in supporting his daughter Ashlei and her children

**Sentencing Memorandum**
*United States v. Jordanov and Lin*
CR 21-00227-WHA

in the wake of the tragic suicide of his son-in-law.  PSR, ¶¶ 74-79; Evangelist Decl., **Exhibit B** at 5, 8,

12, 18.  The need to support his daughter and grandchildren has been forefront in Mr. Jordanov's mind

since the suicide, and he intends to continue supporting them upon his release from custody.

Mr. Jordanov's history of generosity to friends and strangers alike does not forgive or excuse the

crimes he committed and for which he must be punished.  And his proven ability to do hard, honest

work does not offset the harm his conduct caused.  But these qualities and this history do indicate how

Mr. Jordanov is likely to conduct himself during supervised release and beyond

A.     **A Sentence of Six Months of Custody and Nine Months of Home Confinement is Sufficient but not Greater Than Necessary to Achieve the Goals of Sentencing**

Mr. Jordanov's crimes are serious, but a sentence of six months of custody and nine months of

home confinement is sufficient to provide just punishment and deter others and Mr. Jordanov from

committing similar crimes.

This recommended sentence will provide just punishment.  Mr. Jordanov is 74 years old and

twice a cancer survivor.  While Mr. Jordanov's doctors are hopeful that he will make a full recovery

from his kidney cancer and avoid a reoccurrence, a custodial sentence of any length, even one six

months, may represent a significant portion of his remaining life.  And Mr. Jordanov will experience his

sentence as harsher than the sheer number of months imply.  He has no criminal history whatsoever and

has never spent so much as a day in custody.  Where, as here, the defendant faces his first incarceration,

even a short period of confinement can provide just punishment.  *United States v. Baker*, 445 F.3d 987,

992 (7th Cir. 2006) ("a prison sentence would mean more to [a defendant who has never been

imprisoned] than to a defendant who previously had been imprisoned.  Consideration of this factor is

consistent with section 3553's directive that the sentence reflect the need for 'just punishment' and

'adequate deterrence.'").

Nor is a lengthier sentence necessary for the public's safety or to impress on Mr. Jordanov the

need to reform.  Indeed, Mr. Jordanov has been deterred before serving a single day of his sentence.  Mr.

Jordanov feels remorse for his conduct and has worked to understand why he came to commit these

crimes.  In his letter to the Court, Mr. Jordanov describes the soul-searching he has done:

> I have spent many hours coming to grips with why I engaged in this criminal conduct.  I
> didn't commit my crimes because I was financially desperate.  I certainly didn't commit

**Sentencing Memorandum**
*United States v. Jordanov and Lin*
CR 21-00227-WHA

them because of negative feelings about Genentech . . . I have come to understand that I was driven by ego, by a need to create something of my own. I was so driven by that goal that I was willing to cut corners, to tell myself lies that what I was doing was OK, and to keep that information from our investors[.]

Evangelist Decl., **Exhibit A**.

He goes on to explain how "profoundly ashamed" he is of himself and how his actions have already "destroyed a professional reputation I was proud of, damaged the good cause we were working towards, and ended my career in disgrace." *Id*.   Mr. Jordanov's remorse is also expressed in the letters from those who know him best, and in the extensive steps he took to accept responsibility for his conduct and cooperate with the victim of his fraud.   And of course, because of his age, Mr. Jordanov is statistically less likely to engage in recidivist criminal conduct.   *See* J. Ulmer & C. Van Asten, *Restrictive Intermediate Punishments and Recidivism in Pennsylvania*, 16 FED. SENT. R. 182 (2004) (noting in analysis of sentencing data that "[r]ecidivism declines considerably with age").

Finally, imposing the defense's recommended sentence will deter others in Mr. Jordanov's position.   That recommendation imposes a concrete prison sentence upon an elderly, recent cancer survivor with no prior record of criminal conduct.   There is nothing to indicate that an even harsher punishment is needed to deter others from similar crimes.   *See* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-49 (2007) ("certainty of punishment is empirically known to be a far better deterrent than its severity . . . there is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("certainty and promptness of punishment are more powerful deterrents than severity . . .increases in severity of punishments do not yield significant (if any) marginal deterrent effects.").   A sentence of six months custody and nine months home confinement will also send a clear message to would-be defendants residing overseas that if you voluntarily return to this country and accept responsibility for your actions, your sentence will take that into account, along with considerations of your age, health, and other personal circumstances. The defense's recommended sentence thus adequately deters would-be criminals in Mr. Jordanov's position and encourages those who have committed a wrong to return to the U.S. to face the music.

**Sentencing Memorandum**
*United States v. Jordanov and Lin*
CR 21-00227-WHA

**B.    The Goals of Sentencing Can be Achieved Without Imposing a Fine**

The Court should not impose a fine.[12]  When Mr. Jordanov completes the custodial aspect of his sentence, he will be in his mid-70s with his professional reputation ruined, and no hope of future employment.  He owns no real property, no vehicle, and does not have healthcare coverage aside from Medicare (including the Medicare supplement he purchases).  Mr. Jordanov must provide for all future housing costs and medical expenses not covered by Medicare out of his Social Security income and IRA assets.[13]  As he ages, he will be responsible for not only ordinary living expenses, but also any assisted living or skilled nursing facility care he requires.  Retirement and end-of-life expenses such as these may quickly outstrip the assets available to Mr. Jordanov.  In addition, Mr. Jordanov has already taken the extraordinary step of financially compensating his victims, Sanofi and Genentech, even before resolution of the criminal matter.  Mr. Jordanov, therefore, submits he does not have the ability to pay a fine, nor is a $10,000 fine needed to achieve the goals of sentencing.

/ / /

/ / /

---

[12] The parties, the Probation Office, and the corporate victims agree that the Court should not enter a restitution judgment.  *See* Dkt. 21, ¶ 8 (plea agreement stating the government will not seek restitution from Mr. Jordanov if he settles with his corporate victims); PSR, ¶¶ 40-41 (corporate victims confirming fact of settlement and stating they are satisfied with restitution already made by Mr. Jordanov); PSR, ¶¶ 111-12 (explaining that pursuant to the MVRA, a restitution judgment should not be entered because in this case "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." citing 18 U.S.C. § 3663A(c)(3)(B)).

[13] Mr. Jordanov has traditional IRA accounts.  His withdrawals from these accounts will be taxed at as income.

**Sentencing Memorandum**
*United States v. Jordanov and Lin*
CR 21-00227-WHA

-18-

## IV.     CONCLUSION

For the foregoing reasons, the defense respectfully requests that the Court sentence Mr. Jordanov to six months of imprisonment to be followed by three years of supervised release, a condition of which will be to serve nine months of home confinement.  The defense also requests the Court set Mr. Jordanov's self-surrender date in July 2022 to allow him to undergo a second cancer-screening MRI or ultrasound before he enters custody.  Finally, the defense requests that the Court recommend to BOP that Mr. Jordanov be designated to serve his sentence at the satellite camp at USP Lompoc.

Respectfully submitted,

DATED:      March 8, 2022

_____/s/_____
Edward W. Swanson
Britt Evangelist
SWANSON & MCNAMARA LLP
Attorneys for RACHO JORDANOV

**Sentencing Memorandum**
*United States v. Jordanov and Lin*
CR 21-00227-WHA